UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
:
WILLIAM J. PFUNK,                                                       :
:                          12 Civ. 8971 (PAE)
                                              Plaintiff,                :
:
                     -v-                                                :                  OPINION & ORDER
:
COHERE COMMUNICATIONS, LLC and                                         :
STEVEN T. FRANCESCO,                                                   :
:
                                              Defendants.              :
:
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

Plaintiff William J. Pfunk ("Pfunk") brings this action under the Uniformed Services

Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301–4335 ("USERRA"). Pfunk

makes two related claims. First, he asserts, his military obligation to the United States Army

Reserves was a "motivating factor" in the decision by defendant Steven Francesco, the chief

executive officer of defendant Cohere Communications, LLC ("Cohere"), to discharge Pfunk

from employment at Cohere, in violation of USERRA § 4311. Second, he asserts, Cohere's

refusal (also per Francesco) to re-employ him after his return from military service violated

USERRA § 4312. Pfunk claims that these violations of USERRA were willful, within the

meaning of USERRA § 4323(d)(1)(C). On March 31, 2014, the parties filed cross-motions for

summary judgment.

On May 12, 2014, the Court issued a "bottom-line" Order, stating that Pfunk's motion

would be granted in part and denied in part, and that defendants' motion would be denied in its

entirety, and setting the case for trial in July. *See* Dkt. 81. Trial has since been set to commence

on July 14, 2014. This Opinion & Order explains the Court's ruling.

I.    **Background**[1]

A.    **Pfunk's Military Service**

On December 6, 2006, Pfunk joined the United States Army Reserve.  Poscablo Decl. Ex.

A ("Pfunk Dep. I") at 25.  Between July 2, 2007 and February 1, 2008, Pfunk completed basic

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of their cross-motions for summary judgment, including:  Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. 47); Plaintiff's Response to Defendants' Local Rule 56.1 Statement ("Pl. Resp. 56.1") (Dkt. 69); the Declaration of Christine S. Poscablo in Support of Plaintiff's Motion for Summary Judgment ("Poscablo Decl.") (Dkt. 48) and attached exhibits; the Declaration of Christine S. Poscablo in Opposition to Defendants' Motion for Summary Judgment ("Poscablo Opp. Decl.") (Dkt. 72) and attached exhibits; the Declaration of Jacob Mendelson in Support of Plaintiff's Motion for Summary Judgment ("Mendelson Decl.") (Dkt. 49); the Declaration of Anthony Alicea in Support of Plaintiff's Motion for Summary Judgment ("Alicea Decl.") (Dkt. 50); Defendants' Local Rule 56.1 Statement ("Def. 56.1") (Dkt. 52); Defendants' Response to Plaintiff's Local Rule 56.1 Statement ("Def. Resp. 56.1") (Dkt. 67); the Declaration of Steven T. Francesco in Support of Defendants' Cross-Motion for Summary Judgment ("Francesco Decl.") (Dkt. 53); the Declaration of Devin R. Robinson in Support of Defendants' Cross-Motion for Summary Judgment ("Robinson Decl.") (Dkt. 54) and attached exhibits; the Declaration of Steven T. Francesco in Opposition to Plaintiff's Motion for Summary Judgment ("Francesco Opp. Decl.") (Dkt. 70) and attached exhibits; and the Declaration of Devin R. Robinson in Opposition to Plaintiff's Motion for Summary Judgment ("Robinson Opp. Decl.") (Dkt. 71) and attached exhibits.  References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited therein.  Where facts stated in a party's Statement of Material Facts are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The following abbreviations are used herein for the parties' memoranda of law:  (1) Plaintiff's Memorandum of Law in Support of the Motion for Summary Judgment ("Pl. Br.") (Dkt. 46); (2) Defendants' Memorandum of Law in Support of the Cross-Motion for Summary Judgment ("Def. Br.") (Dkt. 55); (3) Plaintiff's Memorandum of Law in Opposition to Defendants' Cross-Motion for Summary Judgment ("Pl. Opp. Br.") (Dkt. 68); and (4) Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp. Br.") (Dkt. 65).

and advanced individual training; between July 1, 2008 and August 1, 2009, he was deployed to Iraq.  *Id.* at 26, 32.  Upon return from his deployment, Pfunk continued serving in the Army Reserves.  He is currently an "all-source intelligence analyst" with a rank of Staff Sergeant.  *Id.* at 28, 32; Pl. 56.1 ¶ 4.  As such, Pfunk is trained to operate certain military communications networks, such as the "Non-secure Internet Protocol Router Network (NIPRnet)," the "Secret Internet Protocol Router Network (SIPRnet)", and the "Radio Over Internet Protocol Network (RIPRnet)."  Robinson Decl. Ex. 2.

B.    **Pfunk's Employment By Cohere**

On November 8, 2011, Pfunk began working for Cohere.[2]  Pl. 56.1 ¶ 1.  Cohere is a telecommunications company that provides conferencing and Voice Over IP services, as well as financial applications to ensure regulatory compliance.  Def. 56.1 ¶ 2.  Pfunk was hired by Francesco, who is Cohere's chairman, secretary, president, and Chief Executive Officer.  *Id.* ¶ 4; Pl. 56.1 ¶ 2.  Francesco acknowledges that there was no set end-date for Pfunk's job.  Poscablo Decl. Ex. B ("Francesco Dep.") at 60–61.

Pfunk was initially paid $50 per day but, soon after he began at Cohere, he requested a pay raise.  Francesco Decl. ¶ 19.  On November 21, 2011, Cohere began paying Pfunk $15 per hour.[3]  Pl. 56.1 ¶ 8.  Pfunk was paid $15 per hour until he was terminated about five months

---

[2] Defendants purport to deny that Pfunk started *working* at Cohere on November 8, 2011, instead stating that Pfunk "began his *internship* on or about November 8, 2011."  *See* Def. Resp. 56.1 ¶ 1 (emphasis added).  However, whether Pfunk was an employee (as opposed to an intern) is a legal question for the Court, which is addressed *infra*.  Because it is undisputed that, factually, Pfunk began working at Cohere on November 8, 2011, the Court has disregarded defendants' assertion that his activities at Cohere that began on that date constituted "work."  The Court has similarly disregarded all of defendants' semantic denials that turn on the meaning of the word "work."

[3] Again, defendants purport to deny this fact; it is, however, conclusively established by the underlying payroll documents.  *See* Poscablo Decl. Exs. E, G (showing that Pfunk was paid $255 for the 17 total hours, *i.e.*, $15 per hour, he worked on November 22–23, 2011).  Defendants do

later, on April 9, 2012.  *Id.* ¶¶ 3, 8.  Cohere reported Pfunk's pay on a Form 1099-MISC,

Miscellaneous Income, for 2011 and 2012.  Def. 56.1 ¶ 31; Robinson Decl. Ex. 7–8.

      While Pfunk worked at Cohere, he was also enrolled at Hunter College in New York.  *Id.*

¶ 5.  During the 16 weeks that Pfunk was attending classes, he also worked an average of 25

hours per week at Cohere, for a total of 400 hours.  Robinson Decl. ¶ 15.  During the five weeks

that Pfunk was not attending classes, he worked an average of 41 hours per week, for a total of

205 hours.  *Id.* ¶ 16.  Overall, during the 21 weeks he worked for Cohere, Pfunk worked an

average of 28.8 hours per week.  *Id.* ¶¶ 15–16.  Pfunk also worked a total of 69 days—or,

roughly, 3.3 days per week.  *Id.* ¶¶ 10–14.

      Pfunk's job responsibilities included assisting customers as part of Cohere's tech support

operations.  Pl. 56.1 ¶¶ 11–12.  During his time at Cohere, Pfunk handled approximately 84

customer service inquiries, which amounted to an average of 1.2 inquiries per workday.[4]  *See*

Francesco Opp. Decl. ¶ 18; *id.* Ex. A.  Pfunk spent the majority of his time at Cohere, however,

working on a project concerning "VMWare," *see* Pfunk Dep. at 163–65, which is software that

allows for the creation of "virtual" or "cloud-based" servers, Def. 56.1 ¶ 42; Def. Opp. 56.1 ¶ 15.

---

not explain why they deny this fact, other than in the context of denying that Pfunk was an
employee of Cohere.  Because defendants' denial is not supported by admissible evidence, the
Court has disregarded it, as, for that matter, the Court has disregarded all other factual denials by
defendants that are not based on admissible evidence.

[4] Francesco characterizes 84 customer service inquires as "negligible" when compared to the
3,402 customer inquiries that were handled by Cohere during that time period, *see* Francesco
Opp. Decl. ¶ 20; however, there is no evidence in the record that would allow the Court to
determine how long each of Pfunk's 84 inquiries took to complete, or how many customer
service inquiries were handled by other Cohere employees, on average, in a given day.  The
record thus does not permit the Court to determine whether a newly hired employee's handling
of 84 customer service inquiries was or was not substandard or, as defendants put the point,
"negligible."

The VMWare project entailed the building of two servers and a network storage unit, and the installation of software onto those servers.  Def. 56.1 ¶ 40.

On January 17, 2012, Francesco sent a staff-wide e-mail, which stated:

For all

Each of you folks are managing technical/business efforts, or managing client activities or doing both.  Accordingly—at least weekly updates are needed.

The names assigned should expect to present their status to the group and should take on the responsibility by filling in start-dates, mile-stones and anticipated completion dates for each of the tasks in-hand.

. . .

5.  Support services – Orex, ESNA and CME—Khusan and *Bill*

. . .

7.  Productizing Cloud Services—*Bill* and Alessandro

. . .

Thanks—and I would like to have these updates by late afternoon today.[5]

Poscablo Decl. Ex. P (emphases added).  It is undisputed that Francesco's reference to "Bill" in the e-mail was to Pfunk.  Francesco Dep. at 119–123.  Francesco's email thus reflects that the two tasks that Pfunk was "managing"—either from the "technical/business" side of Cohere's business, from the "client activity" side, or "both"—were "support services" and "productizing cloud services."  Poscablo Decl. Ex. P.  With respect to these two issues, Pfunk was responsible for "present[ing his] status to the group" and "filling in start-dates, mile-stones and anticipated completion dates."  *Id.*

---

[5] All communications herein have been reproduced verbatim, including all grammatical and spelling errors.

Later that day, Pfunk responded to Francesco (copying staff@coherecomm.com), with

the following message:

> Staff,
>
> At present I have a couple projects within the cloud/hosting:
>
> Sutton Park Capital
> -   Windows SQL Server 2008 Workgroup edition on the new servers using VMWare – Pricing and negotiation – Waiting for reply – Will followed up with them.  Waiting on reply.
>
> Licenses
> -   Managing VMWare Licenses for new sessions – Technet subscription/ Microsoft licenses – Windows Client Access Licenses – End User licensing – Cost effectiveness – provide for growth (volume licensing) – Creating vSphere 5 and vCenter for fail over / resource pooling.
>
> Productize
> -   Virtual Machine sessions as pre-made products for customer virtualization / migration – Working with Alessandro to breakdown machine capability in line with marketability of virtual sessions.
> -   Costs to virtualize differing servers – Need to provide clients with access to virtual environment.
>
> Multi Media Management LLC (Puerto Rico) – In contact with Carlos Torres, answering questions related to cost of migrating to virtual environment.
>
> Esna / OrecX
> -   Will work with Khusan and Mike to train on Esna and CME within the week.
>
> Bill Pfunk

Poscablo Decl. Ex. P.  Read together, Francesco and Pfunk's e-mails therefore indicate, if not

establish, that Cohere had assigned Pfunk responsibility for "Support services – Orex, ESNA and

CME" (with Khusan), and "Productizing Cloud Services" (with Alessandro).

As part of his primary assignment, Pfunk attended a conference on VMWare and cloud

services for which Cohere paid.  Pl. 56.1 ¶ 19.  In addition, on March 15, March 27, and April 5,

2012, Francesco sent Pfunk e-mails informing him about cloud computing and virtualization forums or webinars that were scheduled for April 12, 17, and 18, and May 7, 2012. *Id.* ¶ 20; Poscablo Decl. Exs. EE, FF, GG. During Pfunk's period of employment, Cohere purchased several servers and software for the VMWare project, which cost the company at least $27,000. *See* Francesco Dep. 130–131, 139–140.

### C.    Pfunk's Military Orders

On Wednesday, April 4, 2012, Pfunk received a text message from the wife of Master Sergeant Juan Unigarro ("Unigarro"), stating that Unigarro wanted to know if Pfunk could sponsor a soldier participating in the 2012 "Best Warrior Competition," which was scheduled for April 9–12, 2012 in Fort Indiantown Gap, PA. Pl. 56.1 ¶¶ 23, 25; Def. 56.1 ¶ 83; Poscablo Decl. HH ("Pfunk Dep. II") at 319–20. The Best Warrior Competition is a multiday event in which soldiers and non-commissioned officers compete across a variety of soldier skills and tasks. Def. 56.1 ¶ 75. The sponsor does not compete, but rather supports the competitor by preparing him or her for the events each day. *Id.* ¶ 78. It is considered an honor both to compete and to serve as a sponsor to a competitor. *Id.* ¶ 79.

At around noon on Thursday, April 5, 2012, Pfunk listened to a voicemail from Unigarro, which stated that Unigarro had had a family emergency and thus needed someone to substitute as sponsor for Specialist Raul Velarde ("Velarde"). Pl. 56.1 ¶ 24; Pfunk Dep. II at 324–25. At 1:47 p.m. on April 5, 2012, Pfunk sent a text message to Command Sergeant Major Daniel Benedict ("Benedict"), who, at the time, was the First Sergeant of Pfunk's company, the Headquarters Company of the 304th Civil Affairs Brigade. Pl. 56.1 ¶ 26; Def. 56.1 ¶ 76. Pfunk's text message stated: "Its SSG Pfunk. Left u a voicemail. I can go to the best warrior if [you] want me to cover down on it for SPC Velarde." Robinson Decl. Ex. 18 ("4/5/12 Text Messages"). Benedict

told Pfunk to submit a Request for Orders ("RFO") and a Defense Travel System ("DTS")

authorization in order to ensure that he would be paid for travel, lodging, meals, and incidentals.

Pl. 56.1 ¶ 26; *see* 4/5/12 Text Messages ("Ok.  Quickly get your rfo in and submit your DTS!");

Pfunk Dep. II at 326–28.

However, at some point during the next few hours, Pfunk spoke by phone to Unigarro,

who informed Pfunk that it was too late for the unit to issue him orders.  Pfunk Dep. II at 329–

30.  Pfunk sent Benedict another text message to that effect.  *See* 4/5/12 Text Messages ("MSG

U said its too late to cut orders for me.  Sorry top.").[6]  Later that day, between 2 p.m. and 7:56

p.m., Pfunk spoke on the phone with Sergeant Major David Bernosky ("Bernosky").  Pfunk Dep.

II at 332–33.  At 7:56 p.m., Pfunk sent Benedict a text message, which stated:  "Bernosky made

some calls.  Im gonna go sponsor velarde now.  Hes doin the paperwork."  4/5/12 Text

Messages.  Benedict responded, "Ok.  I will see you there on Monday."  *Id.*  At 8:53 p.m.,

Velarde, at Pfunk's request, sent Pfunk the operations order for the Best Warrior competition by

e-mail.  Robinson Decl. Ex. 11.  At 9:38 pm., Pfunk replied to Benedict by text message:

"[Bernosky] told me to report to the reserve center at 8 on monday.  I have a copy of the

[operations order].  Not sure [of] the report time [and] place.  [I'll] be in Bristol tmrw if things

need to be wrked out."  *Id.*  Pfunk testified that Bernosky had told him to pick up a physical copy

of his orders at the reserve center in Pennsylvania at 8 a.m. on Monday.  Pfunk Dep. II at 337–

38.

---

[6] MSG U refers to Master Sergeant Unigarro, and "Top" is "a military jargon" for First Sergeant
in the U.S. Army.  Def. 56.1 ¶ 91 (citing Pfunk Dep. II at 330).

Although the parties dispute whether Pfunk's orders were approved in final form on April 5, 2012 or April 9, 2012,[7] there is no dispute that Pfunk, on April 5, 2012, committed to Benedict and Velarde that he would sponsor Velarde during the Best Warrior Competition.  *See* Pfunk Dep. II at 333–35.  However, Pfunk maintains that he remained uncertain as to whether the orders he needed to serve as a sponsor for Velarde would be approved in time for the competition.  *Id.*; Pfunk Dep. I at 198.

### D.      Pfunk's Termination

On Sunday, April 8, 2012 at 8:14 p.m., Pfunk sent Francesco an e-mail with the subject line "Military orders," which stated:

> Steve
>
> Just was informed I have a set orders to prep for a unit competition in Fort Indiantown Gap PA so I won't be in this week.  Khusan and Veeral are keeping up with the vmware.  All the techs have access to the machines and support lines.  I will be available through emails text and phone if needed.

Poscablo Decl. Ex. MM.

Francesco responded the next morning, Monday, April 9, 2012 at 10:56 a.m.:

> Bill:
>
> This last minute notices has raised some real issues to your ability to contribute on a consistent basis.
>
> I run a business which counts on everybody's active participation.
>
> At this junction, you should focus on your "last minute" elective activities—and maybe in the future, when you are more stable, we can re-visit working together.
>
> Best of luck.

*Id.*  Pfunk responded the following morning, Tuesday, April 10, 2012 at 7:34 a.m.:

---

[7] Because the Court denies both sides' motions for summary judgment as to liability, it is not necessary to resolve this subsidiary factual dispute.  However, the Court notes that the physical orders are date-stamped "05 April 2012."  *See* Robinson Decl. Ex. 26 ("Orders").

Steve

My notice to you was as expedient as the notice given to me Sunday evening.  I can forward to you a copy of my federal orders that I now have in hand which I did not Sunday.  My military obligations are not elective activities.  With respect I would like to come in on Tuesday next week when my military obligation ends and discuss this with you.

*Id.*  Francesco responded later that same morning, April 10, 2012 at 8:31 a.m.:

Bill

From waht I know about reserve duty is the obligation is one weekend a month and two weeks in the summer.  Military orders never come as a surprise—unless a time of war.

The way u feel u have obligations—I too have to fulfill the business needs.  If ur needs out way my needs, then I can't see how to continue with ur participation.

*Id.*  About a week later, on Tuesday, April 17, 2012 at 7:09 p.m., Pfunk sent Francesco another

e-mail, which stated:

Steve,

I will be coming in tomorrow around noon to the front desk to drop off keys.  It is my understanding that you spoke to a representative from the ESGR informing you of the USERRA act.  I was informed that I have been terminated for cause.  I have contacted the Department of Labor since that time.  I feel my rights have been violated under the federal USERRA act, the Wage Labor Laws, and the NYC Human Rights Laws.  If you feel we do not need to settle this I will be speaking to my attorney.  I am expecting two checks since my time worked in the office.  One for the last week of March (31 hours), and one for the first week of April (18 hours), a total of 49 hours worked at the rate of 15 dollars per hour.  If possible please mail these to my address given.  Thank you.

William Pfunk

Poscablo Decl. Ex. NN.  Francesco responded on April 18, 2012 at 10:11 a.m.:

Bill

You are welcome to pursue any course of action you deem appropriate—but if you want a war, I can impact your life more than you can screw with mine.

You are not to stop by for any reason.  Your access cards have been disabled and you are no longer welcome at this firm for any reason.  We have a check for your last time sheet, which will be mailed to you and as soon as you forward your last time sheet—a check will be cut for that as well.

Wish you luck—

*Id.*

### E.     The Department of Labor's Investigation of Pfunk's Termination

In April 2012, Anthony Alicea ("Alicea"), a Veterans Program Specialist employed in the Veterans Employee Training Services ("VETS") division of the United States Department of Labor ("DOL"), was assigned to investigate a USERRA complaint that Pfunk had initiated soon after his termination.[8]  Alicea Decl. ¶¶ 1–4; Pl. 56.1 ¶ 36.

On April 19, 2012, Alicea spoke to Francesco for the first time by phone.  Alicea Decl. ¶ 5.  Alicea informed Francesco that he was investigating Pfunk's complaint that he had been terminated in violation of USERRA.  *Id.*  Francesco responded by asserting, *inter alia*, that Pfunk was an intern, that he was being compensated per diem, that he had been an issue since he came on board, and that he had volunteered for his military assignment.  *Id.*; *id.* Ex. A.

On April 20, 2012, Alicea sent Francesco a letter, explaining Pfunk's claims and requesting certain information.  *Id.* ¶ 6; *id.* Ex. B.  Specifically, Alicea requested that Francesco provide a position statement, a copy of Pfunk's personnel file and pay records, Cohere's Military Leave policy, and any additional information Francesco believed would assist in resolving the complaint.  *Id.* Ex. B.  Alicea also advised Francesco that if the evidence supported Pfunk's allegation that he was terminated because of his military service, Pfunk could be eligible for re-

---

[8] Defendants purport to deny this fact, but only on the grounds that they claim Alicea's investigation was "not objective."  Def. Opp. 56.1 ¶ 36.  They do not dispute the fact that Alicea conducted an investigation.  Defendants' denial has therefore been disregarded.

employment and wages and benefits lost as a result of the termination.  *Id.*  Accordingly, Alicea

requested that Francesco explain "specifically why Pfunk was terminated on April 9, 2012."  *Id.*

On April 20, 2012, Francesco sent Alicea an e-mail.  Alicea Decl. ¶ 7; *id.* Ex. C.

Francesco stated that he had received the letter and that he would respond "mid-next week."  *Id.*

Ex. C.  He also stated:

> Keep in mind, Mr. Pfunk was not an employee nor has he ever been an employee
> of Cohere.  He was an intern and under the rules of the internship from any
> university, we are not obligated to provide any payment.  It was the position of the
> firm, that we provide some per diem to cover their lunch expense and travel.
>
> The burden of proof of his employment is upon Mr. Pfunk.  The attached Mr. Pfunk
> describes the acrimony and discontent.

*Id.*  Later that same day, Francesco sent another e-mail, stating:  "If [Pfunk] can provide a pay

stub – with deductions, a letter or email stating his employment or any employment

documentation which would recognize him as an employee, we would then have something to

discuss."  *Id.* Ex. D.

On April 22, 2012, Francesco sent another e-mail to Alicea, attaching Pfunk's timesheets.

*Id.* ¶ 8; *id.* Ex. E.  Francesco asserted that these timesheets "clearly present[] that [Pfunk] was not

an employee."  *Id.* Ex. E.  Francesco also stated:

> Our policy is clear – if military orders did exist that he would have to be present
> them for review prior to his last minute notice.  In addition, Mr. Pfunk had a history
> of providing last minute notice to his availability.  The latest incident wasn't the
> only deciding factor – as his actions disrupted the work environment with other
> employees and interns (which we do have number of them diligently working), but
> Mr. Pfunks work performance and thought process was also subpar and did not
> meet Cohere's standards.
>
> I will also have his 1099 tax filing forwarded, which further supports our position
> that he was compensated as a part-time contractor.
>
> I hope this concludes this matter – as he should be reminded to stay his distance
> from Cohere's premises and employees, as a police report has been filed.

*Id.*  On April 23, 2012, Francesco sent a copy of Pfunk's 2011 Form 1099-MISC, and stated: "I will now consider this matter closed."  *Id.* ¶ 9; *id.* Ex. F.

On April 24, 2012, Alicea responded to Francesco's four consecutive e-mails:

Mr. Francesco,

Thank you for providing me with the following information.  However, I still have to complete my investigation and make a determination in this matter.

Who is ultimately responsible for paying Mr. Pfunk?  Is there another agency involved?  If so, do you have an agreement or contract between the agencies?  If there is an agreement can you please provide this office with a copy?

I will be out of my office tomorrow and will return on April 26th.  If you would like to setup a teleconference I will be more then glad to discuss this matter with you again.

*Id.* Ex. F.  Ten minutes later, Francesco responded:

Anthony

I welcome ur review – but the burden of proof is with Mr. Pfunk.

We provided more than adequate support documentation.

We do not have to further justify our position – as if [we] do proceed to court, I have 22 employees who will swear an affidavit of Mr. Pfunk's intern status.

These constant requests on behalf of Mr. Pfunk are on the brink of harassment.

I will await ur call – but it is our position to consider this matter closed.

*Id.*

On April 26, 2012, Alicea spoke to Francesco by phone.  *Id.* ¶ 10; *id.* Ex. G.  Francesco repeated that he believed the case was closed and that he would not allow Pfunk to return to work.  *Id.* Ex. G.  He further stated that if he was required to rehire Pfunk, he would not pay him and would instead put a chair in the hallway and make Pfunk sit there all day.  He added that instead of putting Pfunk in the hallway, he would put him in a bathroom stall.  *Id.*  Alicea asked

13

Francesco for the names of the interns at Cohere and the names of the employees who had been interns before they were hired as full-time employees. *Id.* Francesco responded that these requests were on the brink of harassment and that he could now file charges against Pfunk for harassment. *Id.* Alicea informed Francesco that the requests were not harassment, but rather, part of a federal investigation, and that he could cooperate, or Alicea could close the case and possibly have the case referred to the Department of Justice. *Id.* Francesco responded, "fuck you" and asked to speak to Alicea's supervisor. *Id.*

Later that day, April 26, 2012, Alicea arranged for a teleconference between himself, Francesco, VETS Senior Investigator Paul Desmond ("Desmond"), and VETS Director Barry Morgan. *Id.* ¶ 11; *id.* Ex. H. During this call, Francesco reiterated the points he had previously made to Alicea—*i.e.*, that Pfunk was an intern; that he would not pay Pfunk if forced to reemploy him; and that Pfunk had "volunteered" to go on active duty. *Id.* Ex. H. Desmond informed Francesco that Pfunk's request to go on active duty orders, or on a voluntary assignment, did not forfeit his rights to protection under USERRA. *Id.* At that point, Francesco reiterated that he would refuse to pay Pfunk and would put a chair out in the hallway where Pfunk could sit and do nothing. Desmond asked Francesco to provide a position letter and supporting documents in order to assist with the investigation. *Id.* Francesco stated that he had provided everything VETS needed, and that he would instead refer the case to his corporate attorney. *Id.*

Alicea communicated with Cohere's counsel in an effort to resolve the case until, on July 3, 2012, he closed his investigation. *Id.* ¶ 12. In August 2012, the DOL referred the case to the Department of Justice ("DOJ"). *Id.*

### F.       Procedural History of this Lawsuit

On December 10, 2012, the Complaint in this case was filed.  Dkt. 1 ("Compl.").  Pfunk, represented by the DOJ,[9] alleges that Cohere and Francesco violated USERRA § 4311 by terminating his employment because of his military service, and violated USERRA § 4312 by refusing to reemploy him upon his return from military service.  Compl. ¶¶ 26, 30.

On March 31, 2014, after the completion of fact discovery, the parties cross-moved for summary judgment.  Dkt. 45–55.  On April 14, 2014, the parties submitted their respective oppositions to summary judgment.  Dkt. 65, 68.

## II.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a

---

[9] Under USERRA § 4323, the Attorney General may litigate on behalf of plaintiffs who are terminated from their jobs because of their military duties or obligations.

grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   Discussion

USERRA is the "latest in a series of laws protecting veterans' employment and reemployment rights going back to the Selective Training and Service Act of 1940."  20 C.F.R. § 1002.2.  "The purpose of USERRA is to encourage military service 'by eliminating or minimizing the disadvantages to civilian careers'; 'to minimize the disruption to the lives' of servicemembers and their employers 'by providing for the prompt reemployment' of servicemembers; and 'to prohibit discrimination' against servicemembers."  *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 174 (2d Cir. 2011) (quoting 38 U.S.C. § 4301(a)).

Here, Pfunk alleges two violations of USERRA:  First, that defendants terminated him because of his military obligations, in violation of Section 4311; and second, that defendants refused to reemploy him upon his return from military service, in violation of Section 4312. Pfunk also asserts that these violations were willful, within the meaning of Section 4323(d)(1)(C).

### A.   Whether Pfunk Was a Cohere Employee

At the outset, the Court must resolve whether the protections of USERRA applied to Pfunk.  That is because defendants have asserted that Pfunk was an intern, not an employee, of Cohere.  *See* Def. Br. at 4.  "To have standing under USERRA, [Pfunk] must have been an employee of [Cohere]."  *See Evans v. MassMutual Fin. Grp.*, 856 F. Supp. 2d 606, 608

(W.D.N.Y. 2012).  The parties have filed cross-motions for summary judgment as to this
threshold question.

USERRA defines "employee" as "any person employed by an employer."  38 U.S.C.
§ 4303(3).  The legislative history of USERRA establishes that Congress intended "employee" to
be defined in "the same expansive manner as under the Fair Labor Standards Act ('FLSA')."
H.R. Rep. No. 103-65(I) at 21 (1993); *see also* 70 Fed. Reg. 75246-01, 75254 (Dec. 19, 2005)
(reaffirming Congress's intent to use the FLSA's definition of employee in the USERRA
context).  The case law applying the term employee under the FLSA therefore applies here.

The distinction on which Pfunk's characterization here turns—between an employee and
an intern—has arisen frequently under the FLSA.  In *Walling v. Portland Terminal Co.*, 330 U.S.
148 (1947), a case involving a railroad that held a week-long training course for prospective
brakemen, the Supreme Court held that "trainees" were not covered employees under the FLSA.
In April 2010, the DOL published a fact sheet listing six factors to be applied in determining
whether interns at for-profit businesses fall within this "trainee" exception.  *See* Poscablo Decl.
Ex. OO (U.S. Dep't of Labor Fact Sheet # 71 (April 2010) ("DOL Intern Fact Sheet")).  Several
courts in this District have since adopted these factors as the test for determining whether an
intern is an employee under the FLSA.  *See, e.g.*, *Glatt v. Fox Searchlight Pictures Inc.*, 293
F.R.D. 516, 530–31 (S.D.N.Y. 2013); *see also Xuedan Wang v. Hearst Corp.*, 293 F.R.D. 489,
492–93 (S.D.N.Y. 2013) (adopting "totality of circumstances" standard, but considering the
DOL factors as relevant to this analysis); *Fraticelli v. MSG Holdings, L.P.*, No. 13 Civ. 6518
(JMF), 2014 WL 1807105, at *2 (S.D.N.Y. May 7, 2014) ("The Second Circuit has not
addressed the standard governing the trainee exception, but it is clear that six criteria enumerated
in a [DOL] fact sheet are at least relevant to, and perhaps dispositive of, the inquiry.") (citations

omitted).  Because the DOL factors are derived from *Walling*, and "were promulgated by the
agency charged with administering the FLSA," they are "entitled to deference."  *Glatt*, 293
F.R.D. at 532.  The DOL factors are whether:

> (1) the internship, even though it includes actual operation of the facilities of the
> employer, is similar to training which would be given in an educational
> environment;

> (2) the internship experience is for the benefit of the intern;

> (3) the intern does not displace regular employees, but works under close supervision
> of existing staff;

> (4) the employer that provides the training derives no immediate advantage from the
> activities of the intern; and on occasion its operations may actually be impeded;

> (5) the intern is not necessarily entitled to a job at the conclusion of the internship; and

> (6) the employer and the intern understand that the intern is not entitled to wages for
> the time spent in the internship.

DOL Intern Fact Sheet.  Affirmative responses to these six factors would support a finding that
Pfunk was an intern.  Negative responses, in contrast, would support a finding that Pfunk was an
employee.  However, "[n]o single factor is controlling; the test requires consideration of all the
circumstances."  *Glatt*, 293 F.R.D. at 532 (citations omitted).

Considering the totality of the circumstances, and the six DOL factors in particular, the
Court decisively holds that Pfunk was an employee, not an intern.  Pfunk worked between 25 and
41 hours per week; he was paid $15 per hour; and Cohere had not set an end date for his
employment.  Pfunk received only on-the-job, rather than educational, training; he did work that
provided a tangible advantage to Cohere and displaced regular employees; and his work was

mainly unsupervised.[10]  *See* DOL Intern Fact Sheet ("[I]f the interns are engaged in the operations of the employer or are performing productive work (for example, filing, performing other clerical work, or assisting customers), then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude them from the FLSA's minimum wage and overtime requirements because the employer benefits from the interns' work."); *Glatt*, 293 F.R.D. at 533 (finding that plaintiffs displaced regular employees where defendants' employees would have been required to work longer hours had plaintiffs not performed certain tasks).

Significantly, Pfunk's job responsibilities included assisting customers as part of Cohere's tech support, and leading the effort to "productize cloud services."  As to the first of these responsibilities, it is evident that if Pfunk did not handle his 84 customer service inquires, then some other member of Cohere's staff would have had to have done so.  As to the second, the Court rejects defendants' repeated characterization of Pfunk's VMWare, or cloud services, project as a "training exercise" or a "laboratory project."  *See* Def. 56.1 ¶¶ 39, 42, 43, 47; Def. Br. at 6 (Pfunk "spent most of his time on a laboratory project involving VMWare, a form of software allowing the creation of cloud, or virtual servers," the purpose of which "was to provide [Pfunk] with access to new technology").  The only evidence that defendants cite in support of this claim is Francesco's declaration.  But, viewed in light of all the evidence in the summary judgment record, Francesco's declaration defies credibility.  It is implausible that Cohere would have spent several thousands of dollars on servers and software to support a "laboratory project" or "training exercise" designed only to train Pfunk about basic technology.  Francesco's post-hoc

---

[10] Defendants assert that Pfunk was supervised by Francesco and James Dechiaro ("Dechiaro"). However, in their respective depositions, both Francesco and Dechiaro denied supervising Pfunk. *See* Francesco Dep. at 147; Poscablo Decl. Ex. M ("Dechiaro Dep.") at 16–17.

characterization is also impeached by his email to all Cohere workers referring to "Productizing Cloud Services" as a "technical/business effort"; that would have been a bizarre characterization of a "laboratory project" undertaken solely for an intern's benefit.  Poscablo Decl. Ex. P.

Notably, in the same e-mail, Francesco advised the staff that Pfunk was expected to provide weekly updates—and to set start-dates, milestones, and completion dates—for productizing cloud services.  *Id.* Ex. MM.  Pfunk then responded to every Cohere employee with the requested update and plan.  It is not plausible that Francesco would have listed a mere "laboratory project" on an all-staff e-mail, and required Pfunk to provide weekly updates or to set milestones and completion dates on it.  And nowhere in that e-mail—or anywhere else in the record—did Francesco ever, at the time of Pfunk's employment, refer to "productizing cloud services" as a "laboratory project" or "training exercise."  Because Francesco's after-the-fact characterization of the VMWare project is so implausible that no reasonable jury could believe it, it may not be used to defeat summary judgment on the issue of Pfunk's employee status.  *See Deebs v. Alstom Transp., Inc.*, 346 Fed. App'x 654, 656 (2d Cir. 2009) (if the only evidence cited is self-serving testimony and no attempt has been made to square that testimony with "the hard evidence adduced during discovery," such testimony is insufficient to defeat summary judgment) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Accordingly, applying the DOL's factors, the Court concludes that Pfunk:  (1) was not given training similar to that which would be provided in an educational environment; (2) did not perform the job for his own benefit; (3) displaced regular employees who would otherwise have had to handle Pfunk's 84 tech support requests and to take charge of productizing cloud services; (4) provided an economic advantage to Cohere; and (5) was entitled to wages.  Finally, although defendants assert that Pfunk would not have been entitled to a "permanent" job at the conclusion

of his "internship," that claim has little traction given the lack of a set end date for his employment.  Pfunk's job was already permanent, insofar as the job of any at-will employee can ever be said to be permanent.  Therefore, the DOL factors all support a finding that Pfunk was an employee, not an intern.

In support of their claim to the contrary, defendants rely primarily on subjective, conclusory labels that Francesco placed on Pfunk's job, mainly after the commencement of the DOL's investigation and Pfunk's initiation of this lawsuit.  *See* Def. 56.1 ¶ 19 (Francesco invited Pfunk "to join Cohere as an intern"); *id.* ¶ 20 (Francesco told Pfunk "that he would receive $50 per day, consistent with what other interns received"); *id.* ¶ 21 (Francesco sent Pfunk an e-mail stating, "[i]n evaluating new interns, I want to ensure that Cohere can also meet your objective"); *see also* Francesco Decl. ¶ 12 ("I made clear to [Pfunk] that he would be an intern at Cohere, which would allow him to be exposed to the latest industry technology."); *id.* ¶ 15 ("I looked up the VOW Act and advised Mr. Pfunk that it did not apply because he was not an employee."). Defendants rely heavily on the fact that Cohere chose to report Pfunk's income on a Form 1099-MISC, rather than a Form W-2, *see* Francesco Decl. ¶ 17, and that Pfunk was not provided with paid vacation, medical insurance, retirement benefits, or a business card, *id.* ¶¶ 20–21.  But these facts do not change the analysis.  The DOL's test is made up of *objective* factors.  The *subjective* labels Francesco and Cohere used, largely after the fact—and the decisions they made as to how to report Pfunk's taxable income—are not controlling.[11]  To hold otherwise, in the face of the compelling evidence that Pfunk was an employee, would permit employers to sidestep their legal

---

[11] Although not dispositive, the Court notes that there are instances in the record in which Cohere, contrary to its litigation position here, labeled Pfunk an "employee."  *See, e.g.*, Poscablo Decl. Ex. D (Pfunk's "Employee Profile Sheet," which lists Pfunk's "Employment Position" as "Tech Support").

obligations to an employee—whether under the FLSA or USERRA—merely by applying ill-fitting labels to the employee.  A test like the DOL's, focused on objective and durable facts, not conclusory labels, avoids that pitfall.

Because no reasonable jury could find, under the DOL's six-factor test, that Pfunk was an intern, the Court denies defendants' motion for summary judgment, and grants Pfunk's motion on that point.  Accordingly, the Court holds, as a matter of law, Pfunk was Cohere's employee for purposes of USERRA, and the ensuing litigation in this case must proceed consistent with that holding.

### B.      Whether Defendants Violated USERRA § 4311

Under USERRA § 4311, an employee "who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion or any benefit of employment by an employer on the basis of that membership . . . or obligation."  38 U.S.C. § 4311(a).  An employer violates this provision if "the employee's membership or obligation for service 'is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership' or obligation for service."  *Warren v. Int'l Bus. Machines Corp.*, 358 F. Supp. 2d 301, 310 (S.D.N.Y. 2005) (quoting 38 U.S.C. § 4311(c)(1)).

To determine whether an employer has violated this provision of USERRA, courts in this Circuit apply the burden-shifting framework for actions under the National Labor Relations Act.  *See Gummo v. Vill. of Depew, N.Y.*, 75 F.3d 98, 106 (2d Cir. 1996).  Under that framework, the employee first has the burden of showing, by a preponderance of evidence, that his protected status was "'a substantial or motivating factor in the adverse [employment] action.'"  *Id.* (quoting *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983)) (alteration in *Gummo*).  A motivating

factor "is not necessarily the sole cause of the action, but rather it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Fink v. City of New York*, 129 F. Supp. 2d 511, 520 (E.D.N.Y. 2001) (citation omitted).  When the employee has met this burden, "the employer may nonetheless escape liability by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status." *Gummo*, 75 F.3d at 106 (citing *NLRB*, 462 U.S. at 401)).

On summary judgment, the Court must therefore determine: (1) whether there is sufficient evidence from which a rational jury could infer that Pfunk's status or conduct as a reservist was a substantial or motivating factor in his termination; and (2) if there is such evidence, whether there is sufficient evidence from which a rational jury could infer that defendants would have terminated Pfunk even if he had not been a reservist.  *See Gummo*, 75 F.3d at 106–07; *Warren*, 358 F. Supp. 2d at 311.

In this case, disputed issues of material fact preclude summary judgment for either side on Pfunk's § 4311 claim.

On the one hand, a reasonable jury could readily conclude that Pfunk's military obligation was a substantial or motivating factor in Francesco's decision to terminate Pfunk's employment with Cohere.  Pfunk can point to at least four categories of evidence supporting his claim that his reservist status was a motivating factor for his discharge.

First, the timing of Pfunk's discharge, coming on the heels of his disclosure of his military obligation, raises an obvious inference that he was terminated because that obligation interfered with his job duties.  Pfunk told Francesco about his military obligation on April 8, 2012; he was fired the next day, on April 9, 2012.  *See Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001) ("Discriminatory motivation under the USERRA may be reasonably

inferred from a variety of factors, including *proximity in time* between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.") (emphasis added).

Second, several of Francesco's e-mails could be read to show that Francesco was mostly distressed by Pfunk's military obligation because he believed that Pfunk's missed days of work would negatively impact Cohere's bottom line, and that this motivated Francesco to terminate Pfunk. In Francesco's e-mail of April 9, 2012, he expresses disquiet that Pfunk's "*elective activities*"—*i.e.*, his Army Reserve obligations—were taking precedence over his obligation to Cohere, and he thus observes that this raises questions about whether Pfunk can "contribute on a consistent basis." Poscablo Decl. MM (emphasis added). Francesco's emails contain other statements that can be read to support this conclusion. These include: "I run a *business* which counts on everybody's active participation"; "maybe in the future, *when you are more stable*, we can re-visit working together"; and "[t]he way u feel u have obligations—I too have to *fulfill the business needs*."[12] *Id.* (emphases added).

---

[12] Defendants repetitively assert, in defending against these claims, that Francesco himself is a Navy veteran. But that fact, although relevant to the jury's assessment of Francesco's state of mind, is, standing alone, far from probative; Francesco's status as a veteran does not afford him immunity against charges that Francesco discriminated against another veteran in violation of USERRA. A rational jury could conclude that Francesco supported the armed forces as a general matter, but that, pitted against his concrete business and financial interests, his support of the military gave way to his business interest in employing personnel who were not subject to being called up for military duty on short notice.

Third, Francesco's behavior *after* he fired Pfunk supports Pfunk's claim of USERRA liability. Francesco argues that he fired Pfunk because he believed that Pfunk had given him late notice of his military commitment and then (purportedly) lied about it, but Francesco's post-termination conduct is hard to square with that claim. In particular, Pfunk offered to assuage Francesco's suspicions by forwarding his orders; tellingly, Francesco refused to take Pfunk up on his offer. At trial, Pfunk can argue, plausibly, that *if* Francesco truly had fired Pfunk because he genuinely believed that Pfunk had provided late notice or was being dishonest about that subject, then Francesco should have been receptive to seeing the evidence Pfunk represented he had to the effect that he had received notice of his military commitment scant days before notifying Cohere. Francesco's lack of interest in these facts, Pfunk may plausibly argue, reveals that Francesco's invocation of Pfunk's purported late notice and/or purported dishonesty was mere pretext. Pfunk may plausibly argue that Francesco's real reason for firing Pfunk was that he had little use for an employee whose military obligations could keep him away from work on short notice.

Finally, in support of his claims, Pfunk may rely on aspects of Francesco's interactions with Alicea, the DOL investigator. First, it appears that Francesco made several admissions to Alicea that he fired Pfunk, at least in part, because Pfunk *voluntarily* accepted military orders. Were a jury were to find that this was a motivating factor of Francesco's and Cohere's, it could find liability under USERRA, because, whether or not Pfunk's orders were voluntary, firing a reservist because he or she receives military orders violates the plain language of Section 4311. *See* 38 U.S.C. § 4311; *see also id.* § 4303(13) (USERRA applies to voluntary service). Second, in response to Alicea's legitimate inquiries, Francesco reacted in a manner that a jury might find aggressive, uncooperative, and truculent. *See supra* Sec. I.E. Although this conduct is also

consistent with the indignation of a person who has been falsely accused, a jury could view Francesco's behavior towards the DOL investigator as obstructive of the investigation and/or indicative of Francesco's awareness of his own wrongful conduct in terminating Pfunk and later in closing his eyes to the evidence that Pfunk sought to present to him.  Such "consciousness of guilty evidence" is also relevant to Pfunk's claim of willfulness, *infra* Sec. III.D.  *See Brown v. Crowdtwist*, No. 12 Civ. 6110 (HB), 2014 WL 1468145, at *5 (S.D.N.Y. Apr. 15, 2014) (in a employment discrimination context, when a plaintiff makes a reasonable showing that one of his employer's explanations is false or misleading, he is generally entitled to have a jury consider whether this false explanation is evidence of consciousness of guilt or a discriminatory motive); *cf. United States v. Lorenzo*, 534 F.3d 153, 161 (2d Cir. 2008) (holding, in criminal context, that "'false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt and have independent probative force'") (quoting *United States v. Johnson*, 513 F.2d 819, 824 (2d Cir. 1975)).

There is thus substantial evidence in the record to support Pfunk's claim that these defendants violated USERRA § 4311.  Defendants' motion for summary judgment is, therefore, properly denied.

That said, however, a reasonable jury could choose to credit Francisco's explanation that Pfunk was terminated, not because of his military obligation, but because Pfunk: (1) provided belated notice of his military orders, which needlessly inconvenienced Cohere; (2) was dishonest with Francesco about when he had received those orders; or, less plausibly, (3) was doing a poor job at work.[13]  Def. Br. at 13–20.  Put differently, a reasonable jury could find that Francesco

---

[13] The only evidence of Pfunk's purportedly poor performance that defendants have identified comes from Francesco's declaration.  *See generally* Def. 56.1 ¶¶ 57–73.  There is other evidence in the record that indicates that Pfunk was performing well in his job, *see* Pl. Rep. Br. at 19–22,

would have made the same decision to terminate Pfunk even if Pfunk had not had a military obligation.  To be sure, Pfunk asserts that Francesco's stated reasons are mere pretext, and has identified substantial evidence in support of that claim, but there is admissible evidence in the record to support Francesco's account.  For one, in his initial e-mail to Pfunk, Francesco put "last minute" in quotation marks, which is consistent with Francesco's claim that he was skeptical at the time that Pfunk had just received notice of his military orders that required his absence from work the following day.  Poscablo Decl. MM.  Moreover, in a follow-up e-mail, Francesco stated, "Military orders never come as a surprise—unless a time of war," Poscablo Decl. Ex. MM, which again supports Francesco's claim that he was upset, not by Pfunk's military obligation, but by what he perceived to be Pfunk's thoughtless last-minute notice and apparent dishonesty on the point.  Based on these contemporaneous e-mails, a reasonable jury could credit Francesco's testimony as to his reasons for discharging Pfunk.

On balance, the evidence on these issues favors Pfunk.  But on summary judgment, it is not the Court's role to make credibility determinations or to choose between two conclusions which each have sufficient support in the evidence to support a jury verdict.  Because a rational jury could find that defendants fired Pfunk either because of his military obligation, or because of his late notice, dishonesty, or poor performance, there are genuine issues of material fact that preclude summary judgment on Pfunk's claim under Section 4311.  Accordingly, the parties' cross-motions for summary judgment as to that claim are denied.

---

and that Francesco had not formed the intent to discharge Pfunk before receiving notice of Pfunk's military obligation.  *See* Francesco Dep. at 180; Pl. 56.1 ¶ 20 (on March 15, March 27, and April 5, 2012, Francesco sent Pfunk e-mails informing him about cloud computing and virtualization forums or webinars that were scheduled for April 12, 17, and 18, and May 7, 2012).

### C.      Whether Defendants Violated USERRA § 4312

"Section 4312 provides that any person whose absence from a position of employment is necessitated by service in the uniformed services is entitled to reemployment rights."  *Warren*, 358 F. Supp. 2d at 310 (citing 38 U.S.C. § 4312(a)).  If the jury finds that Pfunk was fired for legitimate, non-pretextual reasons, defendants, of course, would not have had a duty to re-employ him.  Pfunk's § 4312 claim therefore turns on the same contested facts as Pfunk's § 4311 claim—*i.e.*, whether defendants' decision to terminate Pfunk was valid.  Accordingly, the parties' motions for summary judgment as to Pfunk's § 4312 claim are denied for the same reasons as covered in the discussion, *supra*, of his § 4311 claim.

### D.      Willfulness

"USERRA provides that a prevailing party is entitled to a doubling of the backpay award upon a determination that 'the employer's failure to comply with the provisions of [USERRA] was willful.'"  *Serricchio*, 658 F.3d at 191 (quoting 38 U.S.C. § 4323(d)(1)(C)).  Although USERRA does not define the term "willful," other courts considering this provision have adopted the standard for willful violations of the Age Discrimination in Employment Act ("ADEA").  *See, e.g.*, *Fink*, 129 F. Supp. 2d at 523.  Under the ADEA, a willful violation is one where the employer either "'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [statute].'"  *Id.* (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126 (1985)); *see also Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 281 (2d Cir. 1987); *McGinty v. State*, 193 F.3d 64, 70 (2d Cir. 1999); *Fryer v. A.S.A.P. Fire & Safety Corp., Inc.*, 658 F.3d 85, 91 (1st Cir. 2011) ("[T]he term 'willful' as used in § 4323(d)(1)(C) of USERRA refers to a knowing violation or action taken in reckless disregard of the obligations imposed by USERRA.").

Both sides have moved for summary judgment on the issue of willfulness. However, because the Court has held that Pfunk's USERRA claims are not amenable to resolution on summary judgment, there is no occasion to resolve this question. Accordingly, the parties' motions for summary judgment on willfulness are denied.[14]

## CONCLUSION

For the foregoing reasons, the Court grants Pfunk's motion for summary judgment in part. Specifically, the Court holds, as a matter of law, that Pfunk was an employee of Cohere. The Court, however, denies the parties' cross-motions for summary judgment as to whether defendants violated USERRA §§ 4311 and 4312, and whether any such violations were willful. Those claims will be resolved at trial. As previously ordered, the jury trial in this case will commence on July 14, 2014.

SO ORDERED.

Paul A. Engelmayer
Paul A. Engelmayer
United States District Judge

Dated: May 28, 2014
       New York, New York

---

[14] At trial, the jury will be charged with resolving whether defendants violated USERRA §§ 4311 and 4312. The Court invites the parties to address, in pre-trial submissions to be made along with the joint pretrial order, whether—if the jury determines that defendants violated USERRA—the Court, or the jury, is to determine the question of willfulness. The Court notes that the relevant statutory provision states: "The *court* may require the employer to pay the person an amount equal to the amount referred to in subparagraph (B) as liquidated damages, if *the court* determines that the employer's failure to comply with the provisions of this chapter was willful." 38 U.S.C. § 4323(d)(1)(C) (emphases added). The Court also notes that in *Serricchio*, the jury found that Wachovia's actions violated USERRA at trial; as to the issue of damages, a separate bench trial was held, in which the court determined that Wachovia's violation was willful and that plaintiff was therefore entitled to liquidated damages. *See* 658 F.3d at 173. Because the parties have not had occasion to brief this issue, the Court declines to address whether the question of willfulness is to be decided by the jury or the Court at trial.

29